11ATTORNEY DISCIPLINARY PROCEEDINGS
 

 PER CURIAM.
 
 *
 

 This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondents, E. Eric Guirard and Thomas R. Pittenger, attorneys licensed to practice law in Louisiana.
 

 UNDERLYING FACTS
 

 Respondents are partners in a law practice operating under the name of E. Eric Guirard and Associates, P.L.C. (the “law firm” or the “firm”). The law firm, which has offices in Baton Rouge and New Orleans, has operated since July 1994 and handles primarily plaintiffs personal injury cases.
 
 [1]
 
 In 2000, the ODC began investigating respondents’ employment of five “case managers,” all nonlawyers, who assisted in the processing of the personal injury claims being handled by the firm prior to litigation. One of the primary issues under investigation concerned the compensation of the case managers. These employees were paid their compensation by regular bi-monthly payroll from the firm’s general operating account as a commission computed as a percentage of the firm’s gross legal fees collected on the individual settled cases that the individual case manager worked on and settled during |2the payroll period.
 
 [2]
 
 In 2000, the following nonlawyer personnel were paid them compensation as commissions on the firm’s gross legal fees collected on the settled cases, in the following percentages and amounts, on the following number of settlements made:
 

 Case manager Michelle Clouatre was paid her compensation as commissions on the firm’s gross legal fees at a basic rate of 17% on cases to which she was assigned; 8.5% on cases which were transferred to her from another case manager and subsequently settled; and 5% (unless otherwise noted on the payroll records) on some of the cases to which she was assigned which were ultimately transferred to a litigation attorney and then settled. She was paid approximately $81,492.58 as her compensation in commissions for her work on approximately 261 settled cases.
 

 Case manager Lisa Kaplan was paid her compensation as commissions on the firm’s gross legal fees at a basic rate of 15% on cases to which she was assigned; 7.5% on cases which were transferred to her from another case manager and subsequently settled; and 5% (unless otherwise noted on the payroll records) on some of the cases to which she was assigned which were ultimately transferred to a litigation attorney and then settled. She was paid approximately $68,303.66 as her compensation in commissions for her work on approximately 231 settled cases.
 

 
 *1019
 
 Case manager Trina McAlister was paid her compensation as commissions on the firm’s gross legal fees at a basic rate of 15% on cases to which she was assigned; 7.5% on cases which were transferred to her from another case manager and subsequently settled; and 5% (unless otherwise noted on the payroll records) on some of the cases to which she was assigned which were ultimately transferred to a |,litigation attorney and then settled. She was paid approximately $57,060.28 as her compensation in commissions for her work on approximately 258 settled cases.
 

 Case manager Robin Tucker-Holland was paid her compensation as commissions on the firm’s gross legal fees at a basic rate of 15% on cases to which she was assigned; 7.5% on cases which were transferred to her from another case manager and subsequently settled; and 5% (unless otherwise noted on the payroll records) on some of the cases to which she was assigned which were ultimately transferred to a litigation attorney and then settled. She was paid approximately $39,908.17 as her compensation in commissions for her work on approximately 179 settled cases.
 

 Case manager Verna Schwartz was paid a base salary of $1,384.62 per pay period. On May 17, 2000, she was paid her base salary plus a 5% commission on the firm’s gross legal fees on a case that she managed which was settled. On or about May 18, 2000, a $10,000 quota was instituted for Ms. Schwartz, with an 8% commission being paid only after the quota amount of legal fees had been collected on the settled cases that she managed. She was paid approximately $27,211.31, of which about $3,673.39 represented commissions for her work on approximately 34 settled cases.
 

 Additionally, in the year 2000, and no later than January 31, 2001, the firm’s officer manager, Kim Gautreaux, was paid as her compensation a 1% commission of the firm’s total gross legal fees collected on all settled cases, in addition to her salary. She was paid $63,679.23 as compensation in the year 2000, of which about $28,169.84 represented commissions on approximately 1,100 settled cases.
 

 Benita Zombo was employed by the firm as a legal assistant to attorney Joseph Durio. During the year 2000, but not later than January 31, 2001, Ms. Zombo was Rpaid her compensation as a salary of $840 per pay period, plus either a 6% or a 6.5% commission on the firm’s gross legal fees on the cases assigned to Mr. Durio. Ms. Zombo was paid $49,470.80 as compensation in the year 2000, including about $28,169.79 in commissions on the firm’s gross legal fees on Mr. Durio’s cases, which included approximately 137 settled cases.
 

 During the course of the ODC’s investigation, respondents were advised that the compensation plan as described above appeared to violate the Rules of Professional Conduct. Respondents thereupon ceased this compensation plan as of January 2001.
 

 The ODC also investigated the activities of the case managers and the law firm’s investigators with regard to the unauthorized practice of law. Specifically, the ODC sought to determine whether these nonlawyer employees were properly supervised by respondents or whether the non-lawyers were actually performing the duties of an attorney in violation of the Rules of Professional Conduct.
 

 At respondents’ firm, the receptionist typically transferred telephone calls from new prospective clients to the case manager on duty to receive such calls. If the phone call came in after business hours, an answering service paged the duty case manager. The duty case manager spoke to the new prospective client, and decided if the case was one that the firm would be
 
 *1020
 
 interested in handling. The duty case manager gathered certain information and gave it to one of the law firm’s investigators, who in turn met with the prospective client at his or her home and had the prospective client sign an attorney-client contingency fee contract. The investigator also obtained other signed forms from the client, including releases for medical records and employment and wage information, and took photographs, if needed. The investigator returned the signed contract and other information to the |filaw firm’s office, and was thereupon paid $50 for the visit.
 
 [3]
 
 The investigator also received additional compensation
 
 if
 
 he obtained signed contracts for additional clients while visiting the initial client.
 
 [4]
 

 After the signed contract and other information was returned to the law firm, the material was reviewed by either Mr. Guirard or Mr. Pittenger. In most cases the file was then assigned to a case manager, who processed the file pursuant to instructions contained in the law firm’s Case Manager Manual.
 
 [5]
 
 After the client completed medical treatment, the case manager prepared an evaluation of the case on a form used by the firm. The completed form and the case file were forwarded to either Mr. Guirard or Mr. Pittenger, who would approve a high dollar value and a low dollar value on the case for purposes of making a settlement demand.
 
 [6]
 
 The file was then returned to the case manager, who would send a demand letter signed by a lawyer. The case manager was responsible for contacting the insurance adjuster and negotiating a settlement. When a settlement was reached, the case manager notified the client, arranged for the client to come to the office to pick up the settlement check, and prepared the settlement disbursement statement. Mr. Guirard typically met with the client to disburse the settlement funds.
 

 | (jDuring the course of the ODC’s investigation, respondents were advised that the case manager system appeared to violate the Rules of Professional Conduct.
 
 [7]
 
 In 2001, each lawyer in respondents’ firm was assigned to supervise one case manager (in contrast to the case manager system in which respondents, as well as four to five additional lawyers, together supervised the case managers). Sometime in early 2004, a single lawyer assumed primary responsibility for supervising all of the case managers. The case manager system was completely abolished in November 2004.
 

 DISCIPLINARY PROCEEDINGS
 

 In February 2004, the ODC filed two counts of formal charges against respondents jointly. In Count I, the ODC al
 
 *1021
 
 leged that respondents paid their case managers percentage commissions on gross legal fees, and thereby improperly shared legal fees with nonlawyers, in violation of Rules 5.4(a) and 8.4(a) of the Rules of Professional Conduct. The ODC further alleged that this impermissible fee sharing arrangement created a conflict between the interests of the law firm, particularly the case managers, and the clients whose cases were being handled by the case managers, in violation of Rule 1.7(b). In Count II, the ODC alleged that respondents have employed a “business first” model in operating their law firm,
 
 [8]
 
 resulting in a situation in which their nonlawyer employees have engaged in the unauthorized practice of law, either by design, or by respondents’ failure to supervise, or by some combination of the two. Accordingly, the ODC alleged that respondents’ conduct violated Rules 5.3(a) (responsibilities regarding nonlawyer assistants), 5.5(a) (engaging in the unauthorized practice of law), 5.5(b) (assisting a person who is not a member of the 17bar in the performance of activity that constitutes the unauthorized practice of law), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act, especially one that reflects adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer in other respects),
 
 [9]
 
 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct. The ODC further alleged that the actions of the law firm’s nonlawyer employees operating in the “business first” format established by respondents have, particularly when combined with the fee sharing arrangement in Count I, resulted in and/or created a conflict between the interests of the law firm and the clients whose cases were being handled by the law firm, in violation of Rule 1.7(b).
 

 Respondents, through separate counsel, answered the formal charges and denied any misconduct.
 

 Prior to the hearing in this matter, the parties entered into a joint stipulation of facts setting forth the case managers’ compensation plan, as discussed in detail above. The parties also stipulated that in 2000, “there is no evidence that any case manager or other non-lawyer personnel ever appeared as counsel in court or at a deposition.”
 

 Formal Hearing
 

 The formal hearing of this matter commenced on September 23 and 24, 2004. The ODC presented evidence in support of the formal charges and rested. The hearing was then continued indefinitely while the parties discussed the possibility of resolving the formal charges by consent discipline. However, the parties ultimately decided for various reasons not to pursue consent discipline. Accordingly, the | shearing committee reconvened on May 9, 2007. At this hearing, respondents presented evidence on their own behalf.
 

 Hearing Committee
 
 Report
 
 [10]
 

 After considering the evidence and testimony presented at the 2004 and 2007 hear
 
 *1022
 
 ings, the hearing committee made the following factual findings:
 

 In Count I, the committee adopted the joint stipulation of facts. As stipulated, a commission was paid to nonlawyer employees that was computed as a percentage of the firm’s gross legal fees collected on specific individual settled cases. The testimony of respondents also makes it clear that, for the most part, if the case managers did not settle cases within a particular amount of time, the cases would be transferred to litigation, and the case managers would receive zero compensation for the work they had put into the case, unless a special bonus was assigned. The committee noted that the case managers were compensated on a percentage of the gross fees for each individual file; they were not compensated on a percentage of net profits of the firm.
 

 Based on these factual findings, the committee found that respondents violated Rules 1.7(b), 5.4(a), and 8.4(a) of the Rules of Professional Conduct. The committee specifically rejected respondents’ assertion that the percentage compensation paid to the case managers is a form of profit sharing and therefore ethically permissible,
 
 [11]
 
 agreeing with the ODC that under
 
 In re: Watley,
 
 01-1775 (La.12/7/01), 802 So.2d |a593
 
 [12]
 
 , the splitting of legal fees with a nonlawyer on the gross fee received from a particular file constitutes a violation of Rule 5.4(a). The committee commented that this is not a situation in which the case managers are paid a percentage of net profits at the end of the year on the general business of the law firm; rather, “each nonlawyer receives a piece of the action if the case is [settled] by them. This is fee splitting and always has been.” Moreover, the committee found the arrangement creates a clear conflict of interest between the law firm (particularly the case managers) and the clients. The non-lawyer case manager is being paid on a successful settlement of a claim; if the file is turned over to litigation, the case manager receives nothing, or, at most, a discretionary percentage. Under these circumstances, the committee found the case manager has an “overwhelming motive to settle a claim at any price” before losing control over the file.
 

 In Count II, the committee found that during the year 2000, the case managers negotiated directly with insurance adjusters, reached settlement agreements during telephone conversations when negotiations took place, and dealt directly with clients concerning settlement offers. The corn-
 
 *1023
 
 mittee also found that an attorney in the firm established parameters of a high and a low within which to settle a case, and that the case managers were then allowed to negotiate a settlement between these two figures, independently of any supervision by an attorney.
 

 110Based on these factual findings, the committee found that respondents violated Rules 1.7(b), 5.3(a), 5.5(a) and (b), 8.4(a), 8.4(b), 8.4(c), and 8.4(d). Nonlawyers would initiate the attorney-client relationship and the case managers would advise clients whether they had a viable claim. They also advised prospective clients regarding the execution of legal documents, the attorney-client contract, medical releases, and other documents. In addition, the case managers were given leeway in settling individual cases using their own judgment without supervision from an attorney. The committee acknowledged that an attorney established the highs and lows for settlement purposes, but concluded it was the case manager who utilized the professional judgment in settlement.
 
 [13]
 
 The case managers also had great leeway in managing the file, including obtaining settlement authority from the client, determining liability, determining probable insurance coverage, and determining an applicable prescription date.
 

 Respondents argued that in
 
 Louisiana State Bar Ass’n v. Edwins,
 
 540 So.2d 294 (La.1989),
 
 [14]
 
 this court placed only three
 
 *1024
 
 qualifications on the employment of lay h personnel, stating that it was a violation for a nonlawyer to engage directly in the practice of law, to appear in court, or exercise a lawyer’s professional judgment. The committee found, however, that even if the case managers employed by respondents did not hold themselves out as attorneys, they were nonetheless exercising the “professional judgment” of a lawyer:
 

 ... [T]he leeway given the case managers, their flexibility in settling cases with the client, and their interaction with the client, even if they did not hold themselves out as attorneys, is, at the very least, the exercising of professional judgment. If this is not, then Respondents have gone right up to the edge. However, the Committee thinks that the case managers did exercise professional h?judgment in the administration of these files in violation of the Rules of Professional Conduct.
 

 The committee determined that respondents violated duties owed to their clients, the public, and the legal profession. The committee found respondents acted intentionally but they “were of the sincere belief that they were following professional guidelines and were not in violation of the Rules of Professional Conduct. In this regard, their actions were more negligent than they were intentional.” The committee found no evidence of any harm to respondents’ clients (but noted that “it would be almost impossible to determine that at this stage in the proceedings”), and concluded that the applicable baseline sanction in this matter is suspension.
 

 In aggravation, the committee found a pattern of misconduct, multiple offenses, and substantial experience in the practice of law. The mitigating factors found by the committee are the following: absence of a prior disciplinary record, absence of a dishonest or selfish motive, timely good faith effort to rectify the consequences of the misconduct, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and good character and reputation.
 

 The committee concluded:
 

 The Committee is of the belief that a suspension of one year and a day is appropriate. This is based upon clear factual evidence that the Respondents, during the year 2000, engaged in fee splitting with nonlawyers distributing a portion of attorney fees to the case managers as compensation. In addition, the Committee is also of the belief that the evidence indicates that the ease managers participated in the unauthorized practice of law in the handling of each individual file and in particular the negotiation of a settlement without the proper supervision of a supervising attorney.
 

 Based on this reasoning, the committee recommended that respondents be suspended from the practice of law for one year and one day.
 

 
 *1025
 
 LoBoth the ODC and respondents filed objections to the hearing committee’s report and recommendation. The ODC objected to the leniency of the sanction recommended by the committee and asserted that disbarment is appropriate. Respondents took issue with the committee’s finding that they violated the Rules of Professional Conduct. Alternatively, respondents argued that even assuming the rule violations alleged in the formal charges were proven by clear and convincing evidence, the sanction recommended by the committee is too harsh in light of the significant mitigating factors present. Notwithstanding these arguments, however, respondents subsequently filed a brief with the disciplinary board in which they admitted their misconduct as charged in the formal charges and “ask[ed] for appropriate measure of discipline,” which they suggested was either a public reprimand, or, at most, a fully deferred suspension with supervised probation.
 

 Following the filing of the hearing committee’s report, and prior to the submission of the matter for oral argument before a panel of the disciplinary board, respondents and the ODC filed a pleading captioned “Joint Supplementation of the Hearing Committee Record.” In this pleading, the parties stipulated to the steps taken by respondents to conform them firm’s practices and procedures to the Rules of Professional Conduct. The changes implemented in good faith by respondents included, among others, the payment of fixed salaries to the firm’s nonlawyer staff as of January 2002.
 

 Disciplinary Board Recommendation
 

 After review, the disciplinary board determined that the hearing committee’s factual findings are not manifestly erroneous. The board noted that respondents have now admitted their misconduct as charged in the formal charges, but that for clarity’s 114sake it would nevertheless make specific determinations concerning the alleged violations of the Rules of Professional Conduct:
 

 Rule 1.7
 
 is the general rule dealing with conflicts of interest. The applicable version of this rule provides in subsection (b) that a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer’s responsibilities to another client or to a third person, or by the lawyer’s own interests, unless the lawyer reasonably believes the representation will not be adversely affected and the client consents after consultation. The board found that the system in place at respondents’ law firm in which the case managers were permitted, within a specified time period, to settle cases within “high” and “low” limits created a conflict of interest between the clients and the law firm, particularly the case managers of the firm, because the case managers were being paid based upon a successful settlement of the claim within a certain time frame. If the file was turned over to the litigation section of the firm, the claims manager received nothing, or, at most, a discretionary percentage. As noted by the hearing committee, this created an overwhelming motive to settle a claim at any price before the case manager lost control over the file. The board agreed that this situation created a conflict pursuant to Rule 1.7(b).
 

 Rule 5.3(a)
 
 provides that with respect to a nonlawyer employed or retained by or associated with a lawyer, a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person’s conduct is compatible with the professional obligations of the lawyer. Here, respondents allowed the case managers to improperly settle cases, which was not compatible with respondents’ professional
 
 *1026
 
 obligations pursuant to Rules 5.5(b) (a lawyer shall not assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law) and 1.7(b). The board agreed that respondents violated Rule 5.3(a).
 

 |
 
 ufiule 54(a)
 
 provides, in part, that a lawyer or law firm shall not share legal fees with a nonlawyer, except that a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or part on a profit-sharing practice of law. The board found this rule was violated because the case managers were paid by a commission method of compensation based upon the gross attorney’s fees of a particular file and not the firm’s net profits. The record also indicates that the firm’s office manager and at least one secretary of the firm were paid commissions on the firm’s gross legal fees collected on various cases.
 

 Rule 5.5
 
 provides that a lawyer shall not (a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or (b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law. Respondents violated both subsections because they allowed the case managers to give legal advice to the firm’s clients concerning the settlement of their cases, and allowed the case managers to negotiate the clients’ claims with insurance adjusters, after giving the case managers latitude to determine the correct settlement amount within a high-low range. Moreover, respondents violated these subsections by allowing their investigators to engage in the unauthorized practice of law. These individuals, upon the initial meeting with the prospective clients, advised the clients regarding the execution of legal documents, including a contract of employment, medical releases, an insurance search disclosure form, employment and wage information releases, and conflict of interest releases.
 

 Rule 84(a)
 
 states, among other things, that it is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct. By their conduct in violation of the other rules of Professional Conduct, respondents have violated Rule 8.4(a).
 

 |
 
 mRule 84(b)
 
 states that it is professional misconduct for a lawyer to commit a criminal act, especially one that reflects adversely on the lawyer’s honesty, trustworthiness or fitness as a lawyer in other respects. Here, the board found that Rule 8.4(b) was violated because respondents assisted their case managers and investigators in the unauthorized practice of law, which is a felony.
 

 Rule 84(c)
 
 states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The board found respondents violated this rule because the firm’s clients were not specifically advised that their cases would be negotiated or settled by case managers. Having the case managers negotiate and settle the cases was a misrepresentation by omission to the clients, particularly considering that clients were given the “E Guarantee,” which implied that a lawyer, not a case manager, would handle the case.
 
 [15]
 

 Rule 84(d)
 
 provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice. The board found Rule 8.4(d) was violated because the ease man
 
 *1027
 
 agers and investigators engaged in the unauthorized practice of law.
 

 In addition to these rule violations, the board found there was sufficient evidence presented to find respondents engaged in improper client solicitation, in violation of Rule 7.2, a violation not charged by the ODC in the formal charges.
 

 Rejecting the hearing committee’s finding that respondents confected the law firm’s procedures and compensation plan in a “negligent” fashion, the board determined that respondents’ conduct was intentional. The board found that the law firm’s office procedures were carefully crafted and documented in forms and in a Case Manager Manual, and that respondents expected their employees to follow these 117procedures, notwithstanding any suggestion by Mr. Guirard to the contrary.
 
 [16]
 
 The board determined that although no actual harm was proven as to any specific client, the potential for harm to clients, the public, the legal system, and the profession was immeasurable. By allowing nonlawyers to practice law, respondents ran the risk of having cases settled improperly and proceedings later being declared nullities. By implementing the compensation plan at issue, the potential for conflict between the client’s interests and the case managers’ interests was also great.
 
 [17]
 
 Further, by improperly paying their case managers and investigators bonuses for “signing up” clients, the reputation of the legal profession and the legal system has undoubtedly been marred. The board found the applicable baseline sanction is disbarment.
 

 In aggravation, the board found a pattern of misconduct, multiple offenses, substantial experience in the practice of law, and illegal conduct. The mitigating factors found by the board are the following: absence of a prior disciplinary record, timely good faith effort to rectify the consequences of the misconduct, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and good character and reputation.
 
 [18]
 

 The board then turned to a discussion of the prior cases involving misconduct similar to respondents’. With respect to respondents’ failure to supervise and facilitation of the unauthorized practice of law by their nonlawyer staff, the board cited
 
 In re: Sledge,
 
 03-1148 (La.10/21/03), 859 So .2d 671. In
 
 Sledge,
 
 the (^respondent operated a high-volume personal injury practice as a solo practitioner. Mr. Sledge’s staff included two nonlawyers, Lil Lalumandier and Wendy LeBleau, who were employed as his office manager/litigation supervisor and his legal assistant, respectively. Non-litigation matters ordinarily went to Ms. LeBleau, who would oversee the clients’ medical treatment, verify insurance, correspond with insurance adjusters, and prepare demand letters seeking sums based on guidelines used in all cases. Following her preparation of a demand letter, Ms. LeBleau would direct the matter to Ms. Lalumandier, who would negotiate and settle the
 
 *1028
 
 matter directly with the insurance adjuster. At no point during this process did Mr. Sledge directly supervise or review the work of his staff; indeed, in most cases, he had not even met the client his firm was representing. In the litigation files, all petitions and other pleadings were drafted by various non-attorney employees using general pleading forms. The staff signed the pleadings and correspondence with Mr. Sledge’s signature or used a rubber stamp to do so, even if he was present in the office. In most instances, Mr. Sledge did not review the pleadings or correspondence that left his office; by all accounts, he simply participated in depositions and made court appearances. Mr. Sledge’s law office operated in this fashion from 1996 to 1998, during which Mr. Sledge was absent
 
 from his
 
 office for several months at a time.
 

 This court found that Mr. Sledge had neglected his law practice and failed to exercise any meaningful supervision over his nonlawyer assistants, thereby allowing them to engage in the unauthorized practice of law. The ODC also proved that Mr. Sledge made cash payments to three individuals for client referrals. The court imposed disbarment for this misconduct. In support, the court cited
 
 In re: Brown,
 
 01-2863 (La.3/22/02), 813 So.2d 325, in which it held that disbarment was the appropriate sanction for an attorney who completely delegated the exercise of his professional judgment to a nonlawyer and exercised no supervision over the |]9nonlawyer.
 
 [19]
 
 The court also reaffirmed its holding in
 
 Edwins, supra,
 
 that disbarment is the pri-ma facie appropriate sanction for facilitating the unauthorized practice of law by a nonlawyer.
 

 The board found respondents’ conduct was similar to that seen in
 
 Sledge, Brown,
 
 and
 
 Edwins.
 
 Like Mr. Sledge, respondents delegated tasks to nonlawyers which included the negotiating and settling of client matters. Respondents also paid investigators and case managers fees for “signing up” clients. The board acknowledged that respondents likely exercised more supervision over the employees in their Baton Rouge office than Mr. Sledge did over his office; however, that was not the case in respondents’ New Orleans office. In New Orleans, respondents had no resident lawyer present from June 1999 until July or August 2000. Rather, only a case manager, Verna Schwartz, was present on a daily basis to handle clients’ cases in the manner similar to the procedure used by the case managers in Baton
 
 *1029
 
 Rouge.
 
 [20]
 
 One of the respondents traveled to work in the New Orleans office only one day a week. Moreover, like the respondents in
 
 Brown
 
 and
 
 Edwins,
 
 respondents have aided their nonlawyer employees in the unauthorized practice of law.
 

 12ftAs to the Rule 5.4 violation, the board found
 
 Watley, supra,
 
 instructive. Like the respondents in
 
 Watley,
 
 respondents in the instant matter have engaged in improper fee splitting with nonlawyers in violation of Rule 5.4. Also similar to the situation in
 
 Watley,
 
 respondents’ compensation arrangement with their case managers and office staff had the potential to harm their clients. Once the nonlawyers were given a financial interest in respondents’ legal fees, there was the obvious possibility that the interests of the nonlawyers could interfere with respondents’ independent judgment in the case.
 

 The board found the foregoing misconduct warrants serious discipline. Citing Guideline 6 of the permanent disbarment guidelines (insurance fraud, including but not limited to staged accidents or widespread runner-based solicitation), the board recommended that respondents be permanently disbarred.
 

 Respondents filed an objection to the disciplinary board’s recommendation. Accordingly, the ease was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
 

 DISCUSSION
 

 Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence.
 
 In re: Quaid,
 
 94-1316 (La.11/30/94), 646 So.2d 343;
 
 Louisiana State Bar Ass’n v. Boutall,
 
 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings.
 
 See In re: Caulfield,
 
 96-1401 (La.11/25/96), 683 So.2d 714;
 
 In re: Pardue,
 
 93-2865 (La.3/11/94), 633 So.2d 150.
 

 12i Respondents do not contest that they have violated the Rules of Professional Conduct as alleged in the formal charges. Their misconduct involves conflicts of interest, failure to supervise their nonlawyer staff, impermissible fee sharing with nonlawyers, and facilitation of the unauthorized practice of law. Thus, the only issue before us is the appropriate sanction to be imposed.
 

 In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.
 
 Louisiana State Bar Ass’n v. Reis,
 
 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances.
 
 Louisiana State Bar Ass’n v. Whittington,
 
 459 So.2d 520 (La.1984).
 

 The disciplinary board’s recommendation of permanent disbarment has no support in the record, as it is premised entirely on the conclusion that respondents engaged in runner-based solicitation.
 
 *1030
 
 However, the ODC concedes that it did not allege or prove runner-based solicitation. The record does not corroborate a finding of solicitation. Accordingly, we reject the board’s finding and the corresponding recommendation of permanent disbarment.
 

 Our prior decisions in
 
 Sledge, Brown,
 
 and
 
 Edwins
 
 establish that the baseline sanction for the facilitation of the unauthorized practice of law by a nonlawyer is disbarment. In cases involving fee sharing with a nonlawyer, we have imposed a suspension of one year and one day.
 
 In re: Watley,
 
 01-1775 (La.12/7/01), 802 So.2d 593. For respondents’ misconduct involving both facilitation of the unauthorized practice of law and fee sharing, the overall baseline sanction is disbarment.
 

 As aggravating factors, we recognize a dishonest or selfish motive, a pattern of misconduct, and substantial experience in the practice of law (Mr. Guirard was | ¡^admitted in 1987; Mr. Pittenger was admitted in 1992). In mitigation, we find the following factors are supported by the record: absence of a prior disciplinary record, timely good faith effort to rectify the consequences of the misconduct, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, and good character and reputation.
 

 Having considered these factors in light of the record in its entirety, we decline to deviate from the baseline sanction of disbarment. Respondents delegated the handling of their clients’ cases to their nonlaw-yer staff. This was a systematic practice as part of the “business first” model knowingly employed by respondents. By structuring their law firm in the manner in which they did, respondents harmed their clients, who, as we noted in
 
 Sledge,
 
 “were deprived of the benefit of a thoughtful, individualized and professional legal analysis of their cases.” Respondents then motivated the nonlawyers to settle the clients’ claims as quickly as possible in order to collect a paycheck. Of course, these egregious practices profited respondents as well.
 

 We conclude we would be remiss in our constitutional duty to regulate the practice of law if we were to impose any sanction in this case less than disbarment. Therefore, respondents are hereby disbarred.
 

 DECREE
 

 Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that E. Eric Guirard, also known as Eric J. Guirard, Louisiana Bar Roll number 18242, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. It is further ordered that Thomas R. Pittenger, Louisiana Bar Roll number |2⅞21819, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondents in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
 

 *
 

 Retired Judge Philip C. Ciaccio, assigned as Justice
 
 ad hoc,
 
 sitting for Associate Justice Chet D. Traylor, recused.
 

 [1]
 

 . The law firm was originally located in Baton Rouge; the New Orleans office was added in June 1999. At that time, the only employee resident in New Orleans was a case manager, Verna Schwartz, although respondents made an effort to go to the office at least one day a week. In the summer of 2000, respondents hired an attorney to work full-time in the New Orleans office.
 

 [2]
 

 . Most of the case managers were paid their compensation on a straight commission basis, but at least one case manager was paid on a salary/draw plus commission basis.
 

 [3]
 

 . The investigator was paid a lesser sum of $25 if he returned to the office without a signed contract.
 

 [4]
 

 . The investigator was paid $ 15 if he obtained a contingency fee contract signed by a member of the original prospective client's household, and $50 if he signed up a claimant involved in the same accident but who resided outside of the original client's household.
 

 [5]
 

 . As stated in the manual, the firm had "developed a process to handle any size personal injury case in a systematic manner. The name for it is ‘The Case Manager System.' The Case Manager System relies heavily on the use of a well trained staff to mange the majority of the tasks associated with a personal injury case.”
 

 [6]
 

 . The Case Manager Manual stated that the evaluation form would provide a "bottom line settlement” amount set by either Mr. Guirard or Mr. Pittenger, and "the Case Manager does not have authority to settle the case for less than this amount.”
 

 [7]
 

 . Respondents hired the first case manager in 1947. From 1994, when the firm opened its doors, until 1997, the firm did not utilize the case manager system.
 

 [8]
 

 . The record reflects that in November 2003, Mr. Guirard was quoted by the Baton Rouge newspaper as stating, "We always have approached this as a business first and a law firm second.”
 

 [9]
 

 . La. R.S. 37:213 makes it a crime to engage in the unauthorized practice of law.
 

 [10]
 

 .In the section of its report captioned "Introduction,” the hearing committee stated that "the Louisiana Supreme Court ultimately rejected the agreed upon consent discipline and remanded the matter for further proceedings.” This statement is in error, as no petition for consent discipline was ever filed with this court. The hearing committee's misstate-
 
 *1022
 
 menl was corrected by the disciplinary board in its recommendation to this court.
 

 [11]
 

 . Rule 5.4(a)(3) of the Rules of Professional Conduct is an exception to the general rule that a lawyer shall not share legal fees with a nonlawyer. It provides that nonlawyer employees may be included "in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing practice of law.”
 

 [12]
 

 . In
 
 Watley,
 
 the court found the respondents guilty of violating Rule 5.4(a) by entering into a fee sharing contract with a non-attorney. Specifically, the parties created an arrangement whereby the respondents' law firm agreed to pay a paralegal service 40% of the attorney's fees earned on personal injury cases and 60% of the fees earned on cases referred by the paralegal service. The court found the agreement to constitute intentional fee sharing, illustrated by the fact that the firm attempted to hide the arrangement through misleading invoices. Although the court found no indication of direct harm to a client, it cautioned that die arrangement had the potential to cause harm "because once non-lawyers were given a financial interest in respondents’ legal fees, there was a possibility they could interfere with respondents’ independent judgment in the case.” The court concluded this potential harm to clients and to the legal profession warranted discipline in the form of a one year and one day suspension from the practice of law.
 

 [13]
 

 . Respondents testified that when they established the parameters of the settlement, then they have in effect approved whatever settlement occurs. As the committee observed, “The problem with this is that the attorney is not involved in the negotiating process but leaves that to the case manager once the parameters have been established.”
 

 [14]
 

 . In
 
 Edwins,
 
 Rallie Edwins, a Baton Rouge attorney, entered into an arrangement with a paralegal, Rob Robertson, to use Mr. Robertson's paralegal office in New Iberia as Mr. Edwin's branch law office. Mr. Robertson met with a personal injury client and led the client to believe he was an attorney. Mr. Robertson entered into an attorney-client contract with the attorney, but later advised the client that he would be represented by Mr. Edwins. Subsequently, Mr. Edwins was hospitalized, and authorized Mr. Robertson to sign his name to various pleadings. Mr. Ed-wins admitted that he never saw the client’s file. The personal injury case was later settled for $9,000; of this amount, Mr. Edwins turned over $8,000 to Mr. Robertson.
 

 This court, in an opinion by Justice Dennis, held that for purposes of considering whether an attorney has aided a paralegal or other nonlawyer assistant in the unauthorized practice of law,
 

 a lawyer may delegate various tasks to paralegals, clerks, secretaries and other non-lawyers; that he or she may not, however, delegate to any such person the lawyer's role of appearing in court in behalf of a client or of giving legal advice to a client; that he or she must supervise closely any such person to whom he or she delegates other tasks, including the preparation of a draft of a legal document or the conduct of legal research; and that the lawyer must not under any circumstance delegate to such person the exercise of the lawyer’s professional judgment in behalf of the client or even allow it to be influenced by the non-lawyer’s assistance.
 

 Applying these principles, the court found that Mr. Edwins assisted Mr. Robertson in the .unauthorized practice of law;
 

 The respondent attorney in the present case, in our opinion, knowingly assisted the non-lawyer, Robertson, to engage in the unauthorized practice of law. Even if Ed-wins was unaware that Robertson had held himself out as an attorney, we are convinced that he knowingly allowed Robertson to perform the functions of a lawyer in advising prospective clients as to their claims, entering employment contracts with them, preparing and filing lawsuits, motions and briefs for them, counseling them on the advisability of the settlement of their cases, and receiving, distributing and accounting for their settlement funds. Moreover, in all of these respects Edwins delegated the exercise of his professional judgment to Robertson, adopting the non-lawyer’s decisions as his own with little or no supervision by the attorney.
 

 
 *1024
 
 We are convinced further that Edwins assisted Robertson in the unauthorized practice of law with the intent to obtain a benefit for himself and the non-lawyer. Edwins allowed Robertson to hold his paralegal office out to the public as the attorney's branch law office and paid part of the expenses of its operation. Edwins clearly intended to profit and did profit from the attorney fees that were generated by the unauthorized services performed by Robertson. Likewise, the arrangement intentionally benefitted Robertson by enabling Ed-wins to compensate Robertson for his work in connection with cases that Edwins may not have been able to handle without the unauthorized legal assistance of Robertson.
 

 The court concluded that “disbarment is the prima facie appropriate sanction for the respondent's aiding unauthorized practice violation, ...” In light of the numerous aggravating factors present, and considering the absence of mitigating factors, the court disbarred Mr. Edwins.
 

 [15]
 

 . The "E Guarantee” promised that “Your case will be assigned to an attorney!”
 

 [16]
 

 . In his testimony, Mr. Guirard attempted to minimize the significance of the Case Manager Manual, claiming that for the most part, his employees put the manual in their desk drawers and forgot about it.
 

 [17]
 

 . As further evidence of this conflict, the board observed that respondents ran contests in which the case managers were rewarded with trips to Cancún or the Beau Rivage Resort on the Mississippi Gulf Coast if they reached a certain level of fees generated from the settlement of cases during designated time periods.
 

 [18]
 

 .The board specifically rejected the committee's finding that .respondents lacked a dishonest or selfish motive and did not cause harm to their clients.
 

 [19]
 

 . In
 
 Brown,
 
 Tyrone Brown worked as an attorney for the East Baton Rouge Parish Public Defender’s Office. In the course of his employment, Mr. Brown met Robert Matthews, a convicted felon who was later pardoned, who worked as an investigator for the public defender's office. Although Mr. Matthews was not licensed to practice law, he apparently "represented" various personal injury clients and obtained settlements on their behalf from insurance companies. Mr. Matthews was successful in his activities, and many insurance adjusters mistakenly believed he was an attorney. However, his activities later came under suspicion, and Mr. Matthews became the subject of a fraud investigation by the Louisiana State Police.
 

 In order to continue his activities, Mr. Matthews approached Mr. Brown with a scheme whereby Mr. Matthews would act as Mr. Brown's paralegal. Mr. Brown agreed to the scheme and provided Mr. Matthews with blank, pre-signed letters of representation on Mr. Brown's letterhead stationery, which purported to authorize Mr. Matthews to deal with the insurance companies. Additionally, Mr. Brown provided Mr. Matdiews with pre-signed letterhead stationery which was otherwise blank. Mr. Brown also agreed to pay Mr. Matthews an undetermined fee based on the amount of the fee generated by each case.
 

 [20]
 

 . Mr. Guirard testified that there was one extra layer of protection in the New Orleans office. Once Ms. Schwartz effected a settlement within the parameters given to her by respondents, she was required to get the “okay” from respondents concerning the settlement amount before she could relay or finalize the settlement.